UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
EDWIN LUGO, JR.,                                                :

                              Petitioner,     :         06 Civ. 13187 (LAK) (GWG)

     -v.-                                     :         REPORT AND
                                                        RECOMMENDATION
ERIC K. SHINSEKI,[1]                          :

                              Respondent.     :
------------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

          Plaintiff Edwin Lugo, Jr., proceeding pro se, has sued the Secretary of Veterans Affairs

for employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e to 2000e-17 ("Title VII"); the Age Discrimination in Employment Act of 1967, 29

U.S.C. §§ 621-634 ("ADEA"); and the Americans with Disabilities Act of 1990, 42 U.S.C.

§§ 12112-17 ("ADA").  Lugo alleges that he was discriminated against based on his gender, age,

disability, and race, and was also the subject of retaliation.  See Amended Complaint, filed

Apr. 18, 2007 (Docket # 11) ("Compl.").[2]  The Government has moved for summary judgment

on Lugo's claims.  For the reasons stated below, the Government's motion should be granted.

---

          [1] Because Eric K. Shinseki has succeeded James Peake and R. James Nicholson as
Secretary of Veterans Affairs, he is substituted as the defendant in this action pursuant to Fed. R.
Civ. P. 25(d).

          [2] Although the Complaint does not list race as a basis for discrimination, the Government
assumes that this case includes a race discrimination claim under Title VII, and we will as well.

I.      BACKGROUND

       A.      Facts

       Unless otherwise noted, the following facts are either undisputed or consist of evidence

taken in the light most favorable to Lugo.

                          1.      Lugo's Employment History

       Edwin Lugo, Jr. is a 29-year old Hispanic male who was employed by the Bronx

Veterans Affairs Medical Center ("Bronx VA") from January 2002 until January 2006.  See

Deposition of Edwin Lugo, Jr., dated Apr. 6, 2009 (annexed as Ex. A to Corrected Declaration of

Mara E. Trager, dated Oct. 7, 2009 (annexed to Corrected Notice of Motion and Notice to Pro Se

Litigant Opposing Motion for Summary Judgment, filed Feb. 8, 2010 (Docket # 54) ("Corrected

Notice of Motion"))) ("Lugo Dep."), at 5, 7, 113.[3]  Lugo was a program support assistant in the

billing group of the Medical Care Cost Funds ("MCCF") unit of the hospital.  See id. at 24, 28.

Lugo's immediate supervisor during his tenure was Evelyn Morales, and the head of his unit was

Leon Smith.  Id. at 11-12, 28.

       During the years of Lugo's employment under Morales and Smith, Lugo's pay grade rose

from grade 1 to grade 5.  Id. at 25.  Lugo had never received any written warnings from Morales

during his employment.  See Deposition of Evelyn Morales, dated Apr. 7, 2009 (annexed as Ex.

2 to Lugo Decl.) ("Morales Dep."), at 10.

                  2.      Harassment by Leon Smith

       Lugo alleges that Smith harassed him through various comments.  Lugo often wore suits

_____

       [3] Some pages of the Lugo deposition are attached to his own motion papers.  See
Declaration of Edwin Lugo Jr. in Support of Plaintiff's Opposition to Defendant's Motion for
Summary Judgment, filed Nov. 5, 2009 (Docket # 50) ("Lugo Decl."), Ex. 29.

to work, and when he did, Smith asked him if he "was trying to act White," and if Lugo "was trying to take his job." Lugo Dep. at 39. Lugo took this to mean that "blacks and Hispanics aren't suppose[d] to dress in a suit and a tie." Id. at 45.

In 2004, Smith asked Nancy Lugo – Lugo's mother and also a Bronx VA employee – to lie for him in connection with an Equal Employment Opportunity ("EEO") action that Smith himself had brought against the director of the hospital. See Sworn Affidavit of Nancy Lugo, dated Apr. 19, 2009 (annexed as Ex. 25 to Lugo Decl.), at 1-2.[4] After this incident, Smith's harassment of Lugo "intensified," Lugo Dep. at 38, and Smith started calling him a "sissy," see id. at 43-44. In addition, when plaintiff was putting on chap stick, Smith would ask him loudly "what are you putting on lipstick?" Id. at 43-44. Lugo perceived these remarks as "homosexual slurs" and discrimination based on "sexuality." Id.

### 3. Incidents in November-December 2005

Around November 2005, Lugo was involved in an argument with co-worker Mary Stepney. Lugo Dep. at 116-18. Stepney complained to Lugo that he was playing his music too loud. Id. at 117-18. Although Lugo contends that he did not curse at her, id. at 119, Stepney alleged that Lugo told her to "shut the fuck up," EEO Counselor's Report, undated (annexed as Ex. 9 to Lugo Decl.), at 6. Smith brought Stepney and Lugo into his office and asked Lugo to apologize. Lugo Dep. at 119-20. Lugo did not apologize and instead asked Smith, "why are you always harassing me?" Id. at 120. Lugo claims that Smith told him he was "good for nothing," id. at 122, and shortly thereafter, Smith stated at a MCCF unit department meeting that "whenever you put in for a job, I can either give you a good reference or I can give a bad

---

[4] Where necessary, the Court has added page numbers to this and other documents.

reference.  Just remember that," id. at 126.  Lugo believes this comment was directed to him because Smith was looking in his direction when he made the statement.  Id. at 127.

On December 20, 2005, Lugo, along with his mother, saw Alfred Hong, the EEO Officer for the Bronx VA, to seek out some guidance about the conflict between Lugo and Smith.  See Deposition of Edwin Lugo, Jr., dated Feb. 8, 2008 (annexed as Ex. 5 to Trager Decl.), at 26-28. Hong told Lugo and his mother that Hong and Smith were good friends, and asked Lugo to leave his office so that Hong could speak with Lugo's mother in private about resolving the conflict. See Deposition of Alfred Hong, dated Apr. 7, 2009 (annexed as Ex. 5 to Lugo Decl.) ("Hong Dep."), at 10-14.

4.      Lugo's Carpal Tunnel Diagnosis

Lugo states that he began to feel pain in his hands and wrists in November 2005.  Lugo Dep. at 85.  On November 21, 2005, Lugo told his immediate supervisor, Evelyn Morales, that his wrists and arms were hurting, and she sent him to the employee health office.  Id. at 89-91; Report of Accident, dated Nov. 21, 2005 (annexed as Ex. 26 to Lugo Decl.).  Lugo then saw Dr. Chang Chi, a VA Orthopedist, who diagnosed him with carpal tunnel syndrome, put him on occupational therapy three times weekly, and recommended "light duty."  See Lugo Dep. at 69, 105; Medical Record Progress Notes, dated Nov. 21, 2005 (annexed as Ex. L to Trager Decl.); Medical Record Progress Notes, dated Dec. 15, 2005 (annexed as Ex. M to Trager Decl.).  Lugo told Morales and Smith about Dr. Chi's diagnoses and provided them with documentation; however, he alleges that they told him that his documentation was insufficient.  Lugo Dep. at 105, 110-11.  Although Lugo told Smith and Morales of his injury, he did not provide them with medical documentation until January 10, 2006, when he gave it to Smith, but not Morales.  Id.

4

at 110-13.  The documentation that Lugo submitted was not from Dr. Chang, but from Dr. William A. Unis, id. at 111-13, a private specialist whom Lugo had seen, see id. at 69.  It did not state that Lugo should have been assigned to "light duty," but that Lugo could not "return to work until further notice."  Letter from William A. Unis, M.D., dated Jan. 10, 2006 (annexed as Ex. 17 to Lugo Decl.), at 11; Lugo Dep. at 69.  Lugo resigned from his position two days later on January 12, 2006.  Lugo Dep. at 113.

> 5.    Lugo's 2006 EEO Complaint

_____Lugo filed a formal EEO Complaint of Discrimination ("EEO complaint") in July 2006 alleging discrimination and a hostile work environment based on age, sexual orientation, and race.  See Complaint of Employment Discrimination, dated July 9, 2006 (annexed as Ex. B to Trager Decl.).  Lugo listed six incidents as the bases for his claims of discrimination.



_____1) On December 20, 2005 EEO officer Alfred Hong informed me that he is good friends with Mr. Leon Smith and that it would be hard for him to be impartial even though he stated that he knew that Mr. Leon Smith's managerial skills where [sic] very poor.  Instead, he asked me to sit down and allowed me to explain what my concerns were.  At the end of our conversation Alfred Hong stated to me that he would review his schedule and get back to me about when he could meet again, which he never did.  Instead my situation with Leon Smith worsened.

_____2) On December 19, 2005 a supervisor of MCCF, Nate Rogers, made it his business to tell me that I should not make Mr. Leon Smith angry because he does not forget anything and he will make my life miserable.  I took this as an indirect threat from Mr. Leon Smith.

_____3) On December 19, 2005 My chief of MCCF Mr. Leon Smith called an impromptu meeting at which he said, "when you go looking for another job you have to get a reference from me and you can get a good reference or a bad reference[.]" While he was saying this he stared directly at me.  I took this as an indirect threat.  Also 6 months after my resignation I have not been able to get a job.

_____4) On December 19, 2005 my supervisor verbally harassed me by stating, "you are good for nothing."

5

5) On December 19, 2005 my Chief Mr. Leon Smith blamed me at fault for an accident that he did not know the facts to.

6) During September 2005 Mr. Smith was going by the aisle pas[t] my work station and saw me putting on chap stick and very loud made the remark "what are you putting on lipstick."

Id. at 2.  Lugo asserted that Statements 1-4 were a form of "age discrimination because [he] lacked life and work experience which was taken advantage of and at no time did [he] ever have any malicious intent. [His] date of birth is 6/20/80."  Id.  Lugo believed Statement 5 to be a form of racial discrimination because the incident described "occurred between an Afro-American and [Lugo] and the Chief Leon Smith who blamed [him] is also an Afro-American.  Id.  Finally, Lugo thought that Statement 6 was a form of "sexual discrimination" against his "sexuality."  Id.

Lugo also attached a two page letter to the EEO form complaint in which he detailed "humiliation, harassment, disrespect, and moral breakdown."  Id. at 3.  Lugo alleged that Smith called him a "sissy" in front of co-workers and asked Lugo if he was "trying to act white" or "trying to take my job" when Lugo would come into work wearing a suit.  Id.

        6.    VA's Inquiry into Lugo's Allegations

In July or August of 2006, after Lugo had left the Bronx VA and filed his EEO complaint, Hong asked Smith to "speak to certain members of [his] staff regarding aspects of Mr. Lugo's allegations."  Corrected Declaration of Leon Smith, dated Oct. 5, 2009 (annexed to Corrected Notice of Motion) ("Smith Decl.") ¶ 3.  During these discussions, Smith learned that Lugo had allegedly used his work email account to send "sexually-explicit photographs to various female co-workers."  Id. ¶ 3; Ex. A to Smith Decl. (annexing email sent from Lugo's work email account and emailed confirmations of receipt by female employees); Ex. 27 to Lugo

Decl. (annexing same email); Lugo Dep. at 58.  Smith then informed Hong about the information he learned.  Smith Decl. ¶ 4.[5]

7.   <u>Lugo's Applications for Employment at the Montrose VA</u>

In November 2006, Lugo applied for two positions with the Montrose VA.  Lugo Dep. at 141-42, 151, 153; Applications for Federal Employment (annexed as Ex. E to Trager Decl.).  He applied for a "voucher auditor" position and to be a "human resources assistant."  <u>Id.</u>  The human resources assistant position was cancelled and the position was never filled.  <u>See</u> Declaration of Dardanella Russell, dated Sept. 25, 2009 (annexed to Corrected Notice of Motion) ("Russell Decl.") ¶¶ 2-3; Report of Contact, undated (annexed as Ex. A to Russell Decl.) ("The Delegated Examining Unit Vacancy Announcement, DEU-07-V22-MONT, was cancelled before receiving a list of eligible candidates.").

In November 2006, after Lugo submitted his application for the voucher auditor position, Olga Hernandez, the Montrose VA hiring official, attempted to check Lugo's references.  <u>See</u> Deposition of Olga Hernandez, dated Apr. 20, 2009 (annexed as Ex. F to Trager Decl.) ("Hernandez Dep."), at 7-8; Affidavit and Transcript of Proceedings of the Examination of Olga Hernandez, before EEO Investigator Christopher Cooch, dated Oct. 16, 2008 (annexed as Ex. G to Trager Decl.) ("Hernandez Aff."), at 5.  She first contacted Vincent Immiti, Hernandez Aff. at 6, whom plaintiff had listed as his supervisor at the Bronx VA on his application forms, <u>see</u> <u>id.</u>; Applications for Federal Employment at 1, 5.  Immiti informed Hernandez that, contrary to Lugo's claim on his application, he had never been Lugo's supervisor, Hernandez Aff. at 6, Hernandez Dep. at 8, 28, and Hernandez was referred to the Bronx VA human resources

---

[5] For the reasons explained in footnote 14 below, we do not accept Lugo's recent contention that he did not send these emails.

department.  Id.  Hernandez eventually spoke with Morales, who told her that Lugo was a "very

good worker," but Morales answered "negatively" when asked if she would rehire Lugo and

whether his character and honesty were satisfactory.  Hernandez Aff. at 7-8; Declaration of

Evelyn Morales, dated Sept. 24, 2009 (annexed to Corrected Notice of Motion) ("Morales Decl.")

¶ 2.  Morales, however, when questioned by an EEO investigator and later, in her deposition, did

not recall that she answered these questions negatively, only that she felt uncomfortable

answering these questions.  Affidavit and Transcript of Proceedings of the Examination of

Evelyn Morales, before Investigator Christopher Cooch, dated Oct. 14, 2008 (annexed as Ex. I to

Trager Decl.) ("Morales Aff."), at 8-12; Morales Decl. ¶ 4; Morales Dep. at 13, 21.  Morales was

"uncomfortable" answering these questions because the VA had conducted an investigation

following Lugo's EEO complaint which turned up evidence that Lugo had sent sexually explicit

emails to female co-workers during his employment at the VA.  Morales Decl. ¶ 5.  She

therefore directed Hernandez to speak with Hong, the EEO officer.  Id. ¶ 6; Morales Aff. at 10-

12; Hernandez Aff. at 8-9.

Hernandez then called Hong to obtain information about Lugo and to ask whether she

could hire an employee who had a pending EEO case against the VA.  Hernandez Dep. at 7-8,

20; Hernandez Aff. at 10-12.  During the call, Hong informed Hernandez that she could hire an

employee with a pending EEO claim.  Hernandez Aff. at 10-11.  In an email, Hong further stated

that in investigating Lugo's own EEO complaint, a manager in Lugo's former department –

presumably Smith – had questioned his staff about Lugo's EEO allegations of a hostile work

environment.  That questioning in turn "produced incontrovertible testimony from Mr. Lugo's

colleagues that he (Mr. Lugo), at a minimum, was the one engaged in sending highly offensive

and egregious pornographic photos to several female employees."  Email from Alfred Hong to

Olga I. Hernandez, dated Nov. 14, 2006 (annexed as Ex. J to Trager Decl.) ("Hong-Hernandez

Email"); Lugo Decl. Ex. 22 (same).  The email stated that Lugo was an employee "in good

standing" at the time of his resignation but that the pornographic emails would have subjected

Lugo to removal had he not resigned.  Id.

In addition, Hong called Nancy Winter, the public affairs officer at the Montrose facility,

see Deposition of Nancy A. Winter, dated Apr. 20, 2009 (Ex. 6 to Lugo Decl.) ("Winter Dep."),

at 4-5, and told her that "there was evidence of misconduct" in Lugo's past employment at the

Bronx VA, Hong Dep. at 46-47, including the sending of inappropriate emails, see Winter Dep.

at 11-12.  However, Winter played no role in the process for recommending or selecting the

person to fill the voucher position for which Lugo had applied.  Id. at 8.  Hong recommended

that Winter speak with Hernandez, id. at 12-14, and she did so, id. at 15.  During that

conversation, Winter told Hernandez that "the front office or the director's office would not look

favorably on Mr. Lugo because of his inappropriate e-mails."  Id.  Hernandez perceived this

conversation as a recommendation against hiring Lugo.  Hernandez Dep. at 21.  However,

Hernandez testified that she had already made her decision not to hire Lugo prior to that

conversation and had "already submitted the paperwork."  Id.[6]

B.    Procedural History

Lugo filed the instant action against the Secretary of Veterans Affairs on November 14,

---

[6] Lugo's papers also make reference to his claim that he is being subjected to reprisal and
harassment in his current job at the Bureau of Prisons.  See Plaintiff's Memorandum of Law in
Support of his Opposition to Defendant's Motion for Summary Judgment, filed Nov. 5, 2009
(Docket # 49) ("Pl. Opp. Mem."), at 24-28.  The Court decided long ago, however, see Order,
filed June 22, 2009 (Docket # 41); Order, filed Aug. 5, 2009 (Docket # 43), that any claims by
Lugo regarding his employment at the Bureau of Prisons are not part of this case.

2006.  See Complaint, filed Nov. 14, 2006 (Docket # 2).  Following discovery, the Government

moved for summary judgment.[7]  On February 1, 2010, this Court ordered the Government to

provide a memorandum of law and Rule 56.1 statement that contained correct citations.

See Order, filed Feb. 1, 2010 (Docket # 53).  The Government then filed corrected versions of its

submissions.[8]  Shortly thereafter, Court directed the parties to provide additional briefing on the

VA's reason for Hong giving a negative job reference.  See Order, dated Feb. 18, 2010 (Docket

# 57).[9]

---

[7] See Notice of Motion and Notice to Pro Se Litigant Opposing Motion for Summary
Judgment, filed Oct. 8, 2009 (Docket # 46); Trager Decl.; Declaration of Gerda Lloyd, dated
Sept. 25, 2009 (annexed to Corrected Notice of Motion); Russell Decl.; Smith Decl.;
Defendant's Memorandum of Law in Support of Motion for Summary Judgment, filed Oct. 8,
2009 (Docket # 47); Defendant's Statement of Undisputed Material Facts Pursuant to Local
Civil Rule 56.1, filed Oct. 8, 2009 (Docket # 48).  Lugo filed opposition papers. See Pl. Opp.
Mem.; Lugo Decl.  The Government filed reply papers.  Defendant's Memorandum of Law in
Further Support of Motion for Summary Judgment, filed Nov. 30, 2009 (Docket # 52);
Supplemental Declaration of Mara E. Trager, filed Nov. 30, 2009 (Docket # 51) ("Trager Supp.
Decl.").

[8] See Corrected Notice of Motion; Corrected Defendant's Memorandum of Law in
Support of Motion for Summary Judgment, filed Feb. 8, 2010 (Docket # 55) ("Def. Mem.");
Corrected Defendant's Statement of Undisputed Material Facts Pursuant to Local Civil Rule
56.1, filed Feb. 8, 2010 (Docket # 56).

[9] See Supplemental Memorandum of Law Pursuant to the Court's February 18, 2010
Order in Further Support of Defendant's Motion for Summary Judgment, filed Mar. 4, 2010
(Docket # 59) ("Def. Supp. Mem."); Declaration of Alfred Hong, filed Mar. 5, 2010 (Docket
# 60) ("Hong Decl."); Trager Second Supplemental Declaration (annexed to Hong. Decl.)
("Trager Second Supp. Decl."); Supplemental Memorandum of Law Pursuant to the Court's
February 18, 2010 Order in Further Support of Plaintiff's Opposition to Defendant's Motion for
Summary Judgment, filed Mar. 11, 2010 (Docket # 62) ("Pl. Supp. Mem."); Second
Supplemental Declaration of Edwin Lugo Jr., filed Mar. 11, 2010 (Docket # 61) ("Lugo Second
Supp. Decl.").

II.     APPLICABLE LAW

        A.      Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A genuine issue of material fact "may reasonably be resolved in favor of either party" and thus should be left to the finder of fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

When determining whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005) (citation and internal quotation marks omitted).  In other words, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256.  Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (citation, internal quotation marks, and brackets omitted).  Thus, "[a]

11

defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citation omitted); accord Feurtado v. City of N.Y., 337 F. Supp. 2d 593, 599-600 (S.D.N.Y. 2004).

Although the Second Circuit has noted that "an extra measure of caution" is needed in granting summary judgment in discrimination cases since direct evidence of discriminatory intent is rare, a finding of summary judgment is nonetheless appropriate for discrimination claims lacking a genuine issue of material fact. Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted); Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), cert. denied, 534 U.S. 993 (2001).

B.      Law Governing Discrimination Cases

Claims of discrimination under Title VII, ADA, and ADEA are analyzed under the framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (quoting James v. N.Y. Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000)) (Title VII), cert. denied, 549 U.S. 1282 (2007); Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998) (ADA); Tojzan v. N.Y. Presbyterian Hosp., 2003 WL 1738993, at *4-9 (S.D.N.Y. Mar. 31, 2003) (ADA and ADEA). Under McDonnell Douglas, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. See 411 U.S. at 802; accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981);

Joseph, 465 F.3d at 90 (quoting James, 233 F.3d at 154).  This burden has been characterized as

"minimal."  McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006) (citations

omitted); Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005).

      To establish a prima facie case of disparate treatment, a plaintiff must demonstrate that:

(1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered

an adverse employment action; and (4) the action occurred under conditions giving rise to an

inference of discrimination.  See Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (citing

McDonnell Douglas, 411 U.S. at 802).  The fourth element is a "flexible one that can be satisfied

differently in differing factual scenarios."  Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91

(2d Cir. 1996), cert. denied, 531 U.S. 1192 (2001).

      There is a different test for establishing a prima facie case under the ADA.  Under this

test, a plaintiff must show that: "(1) his employer is subject to the ADA; (2) he was disabled

within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions

of his job, with or without reasonable accommodation; and (4) he suffered adverse employment

action because of his disability."  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir.

2006) (quoting Giordano v. City of N.Y., 274 F.3d 740, 747 (2d Cir. 2001)).

      If the plaintiff establishes a prima facie case, a presumption of discrimination is created

and the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for

the adverse employment action.  McDonnell Douglas, 411 U.S. at 802; St. Mary's, 509 U.S. at

506-07; Burdine, 450 U.S. at 253-55; Leavitt, 465 F.3d at 90.  The employer's action need only

be based on a reasonable belief to be legitimate and nondiscriminatory.  See, e.g., Graham v.

Long Island R.R., 230 F.3d 34, 44 (2d Cir. 2000) ("The key question is whether it was

reasonable for the employer to rely on the [information] in making its employment decision.");

Ozemebhoya v. Edison Parking Corp., 2007 WL 2593008, at *7 (S.D.N.Y. Sept. 7, 2007) ("An

employer may sustain its employment decision without showing that the information on which it

relied in its investigation was correct, but only that it reasonably relied on such information.").

If the employer articulates such a reason for its action, the presumption of discrimination is

eliminated, and "the employer will be entitled to summary judgment . . . unless the plaintiff can

point to evidence that reasonably supports a finding of prohibited discrimination." James, 233

F.3d at 154 (citing cases).  Such evidence may include, for example, a showing that "'the

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

discrimination.'" Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (quoting

Burdine, 450 U.S. at 253).  Importantly, "'[t]he ultimate burden of persuading the trier of fact

that the defendant intentionally discriminated against the plaintiff remains at all times with the

plaintiff.'" St. Mary's, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253) (brackets in original);

accord Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000). Thus, it is not sufficient for the

fact-finder to disbelieve the employer's explanation; rather, "'the fact-finder must believe the

plaintiff's explanation of intentional discrimination.'" Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 147 (2000) (quoting St. Mary's, 509 U.S. at 519) (emphasis omitted).  In

other words, the plaintiff "must always prove that the conduct at issue . . . actually constituted

discrimination." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (internal

quotation marks, emphasis, and brackets omitted).

Nevertheless, while the plaintiff must prove that the defendant's proffered reasons for

termination were pretextual, the plaintiff is not always required to "introduce additional,

14

independent evidence of discrimination." Reeves, 530 U.S. at 149.  "In appropriate

circumstances," the evidence of pretext alone will be sufficient to "infer . . . that the employer is

dissembling to cover up a discriminatory purpose." Id. at 147; see also Schnabel, 232 F.3d at 90

("Reeves clearly mandates a case-by-case approach, with a court examining the entire record to

determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact

that the defendant intentionally discriminated against the plaintiff.'") (quoting Reeves, 530 U .S.

at 143).

    We discuss the law governing retaliation claims in section III.D below.

III.    DISCUSSION

        A.    Age Discrimination Claim

    Although he does not discuss the issue in his memorandum, Lugo's complaint asserts that

he has been the victim of age discrimination under the ADEA.  See Compl. at 1.  The ADEA,

however, applies only to persons who are at least 40 years of age.  See 29 U.S.C. § 633a; id.

§ 631(a) ("The prohibitions . . . [against age discrimination] shall be limited to individuals who

are at least 40 years of age.").  This age minimum applies to suits brought by employees of the

federal Government.  Id. § 631(b).  Lugo was born on June 2, 1980 and was 26 years old when

he filed this complaint.  See Compl. at 3; Lugo Dep. at 5.  Therefore, Lugo has failed to state a

claim for age discrimination.  See D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 194 (2d

Cir. 2007) ("The ADEA prohibits discrimination in employment on the basis of age against

persons aged 40 or older." (citing 29 U.S.C. §§ 623(a)(1), 631(a))); Spain v. Ball, 928 F.2d 61,

62-63 (2d Cir. 1991) ("By its terms, the ADEA applies only to those individuals who are 'at least

40 years of age.'" (quoting 29 U.S.C. § 633a(a))); Popa v. PricewaterhouseCoopers LLP, 2009

15

WL 2524625, at *1 n.1 (S.D.N.Y. Aug. 14, 2009) ("as a person still under 40 years of age

[plaintiff] does not have an ADEA cause of action").

      B.      <u>Title VII Discrimination Claims</u>

           1.      <u>Sex and Race Claims</u>

Lugo's claims of sex and race discrimination fail because he has not pointed to any

"adverse action" against him as a result of his race or sex.  An adverse employment action is "a

materially adverse change in the terms and conditions of employment . . . which is more

disruptive than a mere inconvenience or alteration of job responsibilities."  <u>Leavitt</u>, 465 F.3d at

90 (internal citations and quotation marks omitted).  "Examples of materially adverse changes

include termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material responsibilities,

or other indices unique to a particular situation."  <u>Id.</u> (quoting <u>Terry v. Ashcroft</u>, 336 F.3d 128,

138 (2d Cir. 2003)) (internal quotation marks omitted).

Apart from a potential constructive discharge claim, discussed in section III.B.4 below,

Lugo does not point to any adverse action that he links to discrimination based on race or sex.

Indeed, Lugo concedes that his personnel file reflects "nothing but monetary and promotional

awards."  Pl. Opp. Mem. at 25.  He was promoted from a grade 1 to a grade 5 during the time he

worked at the Bronx VA.  Lugo Dep. at 25.

Instead, his brief consists of a number of complaints regarding comments by supervisory

personnel at the Bronx VA (only some of which are supported by admissible evidence).  While

such comments are appropriately analyzed as part of a hostile environment claim, they do not in

themselves show adverse actions.  <u>See, e.g.</u>, <u>Lucenti v. Potter</u>, 432 F. Supp. 2d 347, 363-64

16

(S.D.N.Y. 2006) (harsh reprimands and close scrutiny not adverse action); Katz v. Beth Israel
Med. Ctr., 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001) (being "yelled at by supervisors" not
adverse action); Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001)
("reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse
employment actions"), aff'd, 51 F. App'x 55 (2d Cir. 2002).

Accordingly, Lugo has not made out a claim of discrimination based on his race or sex.

3.      Hostile Work Environment Claim

Lugo purports to make a hostile work environment claim.  See Pl. Opp. Mem. at 16
(Smith's treatment of Lugo "became so severe and pervasive and created an intimidating, hostile
and abusive work environment").  "A plaintiff may establish a claim of disparate treatment under
Title VII either (1) by showing that he has suffered an adverse job action under circumstances
giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national
origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a
hostile work environment."  Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004).  A hostile
work environment claim requires that the plaintiff show "(1) that the harassment was sufficiently
severe or pervasive to alter the conditions of the victim's employment and create an abusive
working environment, and (2) that a specific basis exists for imputing the objectionable conduct
to the employer."  Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (citation and internal
quotation marks omitted).[10]  The plaintiff must demonstrate that, under the totality of the

---

[10] The same general standards apply to both race-based and sex-based hostile
environment claims.  See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.) (standards for evaluating
hostile environment claims are the same whether alleged discrimination is based on race or sex),
cert. denied, 522 U.S. 997 (1997); Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986)
(applying sexual harassment case law in case involving Title VII racial harassment).

circumstances, "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [plaintiff's] employment were thereby altered." Id. at 373-74 (citations omitted).  In order to satisfy this standard, a "'plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [plaintiff's] working environment.'"  Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000) (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)).

In Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993), the Supreme Court listed a number of factors that may be considered in determining whether a hostile work environment exists, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.  "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999) (citing Gallagher v. Delaney, 139 F.3d 338, 347 (2d Cir. 1998)).  However, a hostile work environment claim under Title VII must still meet the causation requirement: that is, that the discrimination occurred "because of" membership in a protected class.  Oncale, 523 U.S. at 79-81.

The comments addressed to Lugo's perceived sexual orientation do not enter our analysis because "Title VII does not prohibit harassment or discrimination because of sexual orientation." Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005) (quoting Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000)) (internal quotation marks omitted).  While case law does permit a claim for discrimination under Title VII based on "sex stereotyping," Simonton, 232 F.3d at

18

37-38, no such claim exists here because there is no evidence that Lugo "behaved in a stereotypically feminine manner." Id. at 38. The remaining comments alleged by Lugo are sufficiently mild and fleeting that no reasonable jury could find that Lugo's workplace was severely "permeated with discriminatory intimidation, ridicule, and insult" such that the terms and conditions of Lugo's employment were altered. Whidbee, 223 F.3d at 69. Nor is any one comment or incident so "extraordinarily severe" that it altered those conditions. Id.

                    4.    Constructive Discharge

Construing Lugo's assertions most liberally, he has arguably raised a claim of constructive discharge. See Complaint of Employment Discrimination at 4 ("I felt like there was no outlet and the humiliation, harassment, [and] stress forced me to make the decision to resign, I just wanted to leave as quickly as possible."). Constructive discharge constitutes an adverse employment action under Title VII. Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir. 2001) ("Such a discharge may be either an actual termination of the plaintiff's employment by the employer or a 'constructive' discharge."), cert. denied, 536 U.S. 922 (2002). A finding of constructive discharge is made if "the trier of fact [is] satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Id. at 358 (quoting Whidbee, 223 F.3d at 73) (internal quotation marks omitted) (omission in original).

Lugo cannot succeed on his constructive discharge claim, however, because "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." Penn. State Police v. Suders, 542 U.S. 129, 149 (2004); accord Finkelshteyn v. Staten Island Univ. Hosp., 2009 WL 935744, at *15 (E.D.N.Y. Mar. 31, 2009); see also

Aspilaire v. Wyeth Pharms., Inc., 612 F. Supp. 2d 289, 311 (S.D.N.Y. 2009) ("claims of

constructive discharge necessarily rely on actionable claims of a hostile work environment");

Divers v. Metro. Jewish Health Sys., 2009 WL 103703, at *19 (E.D.N.Y. Jan. 14, 2009) ("to

demonstrate constructive discharge, the plaintiff must demonstrate harassment that is more

severe and pervasive than that required to show a hostile work environment." (quoting Ternullo

v. Reno, 8 F. Supp. 2d 186, 192 (N.D.N.Y. 1998))); Christopher-Ketchum v. Agway Energy

Prods., 988 F. Supp. 610, 617 (N.D.N.Y. 1997) (same).  Because Lugo has not shown that he

was subjected to a hostile work environment, he cannot make out a constructive discharge claim.

*     *     *

In sum, Lugo's claims for discrimination under Title VII must be dismissed.

C.     ADA Claim

A claim by a federal employee for discrimination based upon a disability is governed not

by the ADA, the statute cited by Lugo, but rather by the Rehabilitation Act.  29 U.S.C.

§§ 791(a), 794(a), (b).  See Rivera v. Heyman, 157 F.3d 101, 103-04 (2d Cir. 1998)

(Rehabilitation Act is the "sole remedy" for a federal employee's disability discrimination

claim).  The distinction matters little, however, because the Rehabilitation Act incorporates the

standards of the ADA, see 29 U.S.C. § 791(g), along with the "remedies, procedures and rights"

of Title VII.  29 U.S.C. § 794a(a)(1).  Accordingly, we make reference to Lugo's "ADA" claim

although it in fact arises under the Rehabilitation Act.

To survive summary judgment on his ADA claim, Lugo must show that: "(1) his

employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was

otherwise qualified to perform the essential functions of his job, with or without reasonable

accommodation; and (4) he suffered adverse employment action because of his disability." Sista, 445 F.3d at 169 (quoting Giordano, 274 F.3d at 747).  Because there is no dispute that the Bronx VA is subject to the ADA, we turn to the second element of Lugo's claim.

Under the version of the Rehabilitation Act in effect at the time of Lugo's claim, an individual with a disability was "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment."  Rehabilitation Act § 6, 87 Stat. 359, 359 (1973) (current version at 29 U.S.C. § 705(20(B) (2010)).[11]  Major life activities are defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  45 C.F.R. § 84.3(j)(2)(ii).  The term "substantially limits" means the inability "to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(1)(i)-(ii).[12]  A court considering whether a condition substantially limits a major life activity may note:

---

[11] Although the ADA's definition of "disability" was amended in January 2009, ADA Amendments Act of 2008, ch. 16, § 7, 122 Stat. 3553, 3558, it does not apply here because the amendment is not retroactive.  See, e.g., Gibbon v. City of N.Y., 2008 WL 5068966, at *5 n.47 (S.D.N.Y. Nov. 25, 2008); Ragusa v. Malverne Union Free School Dist., 582 F. Supp. 2d 326, 340 n.3 (E.D.N.Y. 2008).

[12] While it is not clear that the EEOC has authority to promulgate regulations interpreting the ADA, Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 194 (2002), here both parties make reference to the regulations without questioning their authority, and thus we will accept them as reasonable interpretations of the ADA.  See id. ("Because both parties accept the EEOC regulations as reasonable, we assume without deciding that they are . . . ."); accord Mikell v. Waldbaum, Inc., 2003 WL 21018844, at *3 n.2 (S.D.N.Y. May 5, 2003).

21

 (i) The nature and severity of the impairment;

 (ii) The duration or expected duration of the impairment; and

 (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

Id. at (j)(2).  Finally, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  Id. at (j)(3)(i).

  As the Government argues, courts have often found that carpal tunnel syndrome, alone, does not substantially limit a major life activity.  Def. Mem. at 25 (citing Ruhling v. Tribune Co., 2007 WL 28283 (E.D.N.Y. Jan 3, 2007); Mikell, 2003 WL 21018844; Serrano v. Terence Cardinal Cooke Health Care Ctr., 2002 WL 31027183 (E.D.N.Y. Sept. 9, 2002)).  In this case, Lugo has not shown that his ability to work was "substantially limited" by carpal tunnel syndrome.  There is no evidence of the post-January 2006 duration of Lugo's disability.  Further, he has not shown that he was unable to perform other or different jobs.  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999) (claimant would be required to show inability to work in "broad range of jobs" rather than a specific job); Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir. 1994) ("An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one."), cert. denied, 513 U.S. 1147 (1995).  To the contrary, there is evidence in the record suggesting that Lugo's condition was not long-lasting and that it did not prevent him from seeking additional employment.  For example, Lugo applied for positions with the Montrose VA during 2006 and stated that he could type 45 words per minute.  See Applications for Federal Employment at 2, 6.  Finally, Lugo's medical evidence of his injury is not sufficient to show that his impairment substantially limited his ability to work.  In Toyota Motor Mfg., Kentucky, Inc., 534 U.S. 184, 198 (2002), construing the previous

version of the ADA, the Supreme Court held that "[i]t is insufficient for individuals attempting

to prove disability status under this test to merely submit evidence of a medical diagnosis of an

impairment."  Rather, "the ADA requires those claiming the Act's protection . . . to prove a

disability by offering evidence that the extent of the limitation [caused by their impairment] in

terms of their own experience . . . is substantial."  Id. (citations and internal quotation marks

omitted) (brackets and omissions in original).

Here, Lugo merely provides medical documentation of his injury, and that is not enough

to show he has a disability.  See West v. Port Auth. of N.Y. & N.J., 2002 WL 31027016, at *3

(S.D.N.Y. Aug. 30, 2002) (no disability where plaintiff "simply assume[d] that her diagnosis of

carpal tunnel syndrome, without more, [was] a disability within the meaning of the ADA.").

Lugo has not submitted any admissible evidence as to the limitations of his alleged impairment.

The importance of this evidence is magnified in the case of carpal tunnel syndrome, where "[a]n

individualized assessment of the effect of an impairment is particularly necessary" because "the

impairment is one whose symptoms vary widely from person to person."  Toyota Motor Mfg.,

Kentucky, Inc., 534 U.S. at 199.  At best, the medical notes submitted by Lugo state that his

condition caused him difficulties in "using [his] hands."  See Physician's Report (annexed as Ex.

17 to Lugo Decl.), at 2.  However, even a showing of a limitation in the activity of typing,

without more, is not enough to demonstrate a substantial limitation.  West, 2002 WL 31027016,

at *3 (no disability under ADA where plaintiff "fails to offer a shred of evidence, by affidavit or

otherwise, to suggest that she was limited in any activity other than the tasks of typing and heavy

lifting" because "a person found unsuitable for a particular position has not thereby

demonstrated an impairment substantially limiting such person's major life activity of working."

23

(quoting Heilweil, 32 F.3d at 723) (internal quotation marks and brackets omitted)).

In sum, Lugo has not provided evidence sufficient to show he was disabled under the ADA.  In light of this conclusion, we need not reach the issue of whether the Bronx VA denied him a reasonable accommodation.

_____D.    Retaliation

_____To make out a prima facie case of retaliation under Title VII, a plaintiff must produce evidence that would allow a rational trier of fact to find "(1) [he] participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging [him]; and (3) there exists a causal connection between the protected activity and the adverse action."  Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007) (citation omitted).  To show the protected activity element, "the plaintiff need only have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by" statute.  Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 210 (2d Cir. 2006) (citation and internal quotation marks omitted).  To show adverse action, the plaintiff must prove "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (citations and internal quotation marks omitted); accord Kessler, 461 F.3d at 207.  To prove causation, the plaintiff must show that the protected activity was "a substantial motivating factor" for the adverse action.  Deters v. Lafuente, 368 F.3d 185, 190 (2d Cir. 2004).  "Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of

24

fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir.) (internal citations and emphasis omitted), cert. denied, 484 U.S. 965 (1987); accord Martinez v. N.Y. City Dep't of Educ., 2008 WL 2220638, at *12 (S.D.N.Y. May 27, 2008); Carr v. Westlb Admin., Inc., 171 F. Supp. 2d 302, 309 (S.D.N.Y. 2001). A retaliation claim under the ADA is analyzed "with the same framework employed in Title VII cases." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001); accord Zerilli-Edelglass v. N.Y. City Transit Auth., 2010 WL 475314, at *2 (E.D.N.Y. Jan. 29, 2010).

As discussed above in section II.B, if the plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. If the employer articulates such a reason for its action, the presumption of discrimination is eliminated, and "the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James, 233 F.3d at 154 (citing cases).

Despite the multi-step process set up in McDonnell Douglas, a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action. See, e.g., Graves v. Finch Pruyn & Co., 457 F.3d 181, 188 (2d Cir. 2006) (declining to resolve dispute regarding establishment of prima facie case of age discrimination on the ground that plaintiff had not "pointed to any record evidence to dispute [defendant's] legitimate reason (so far as the ADEA is concerned) for the alleged adverse

employment action"); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001) (declining to decide whether prima facie case was made because the defendant "met its burden to put forth legitimate, nondiscriminatory reasons for [plaintiff's] termination, and [plaintiff] has failed as a matter of law to proffer evidence of pretext sufficient to go to a trier of fact"); Hamilton v. Mount Sinai Hosp., 528 F. Supp. 2d 431, 439-40 (S.D.N.Y. 2007), aff'd, 331 F. App'x 874 (2d Cir. 2009); Morris v. Ales Group USA, Inc., 2007 WL 1893729, at *7 (S.D.N.Y. June 29, 2007); Tomney v. Int'l Ctr. for Disabled, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005).

Lugo asserts there were two acts of retaliation: (1) Montrose VA's failure to hire him, Pl. Opp. Mem. at 3-4, and (2) Hong's provision of a negative job reference, id. at 18-28. The Government has pointed to the same legitimate, nondiscriminatory reason for both: that Lugo had sent sexually explicit photographs by email to several female employees while employed at the Bronx VA. See Def. Supp. Mem at 2, 6. The record is replete with evidence supporting the fact that the Bronx VA had reason to believe that Lugo sent these emails. Copies of the emails, which are graphic and disturbing, have been submitted by both parties, see Smith Decl. Ex. A; Lugo Decl. Ex. 20-21, 27; Hong Decl. Ex. A; Lugo Second Supp. Decl. Ex. 3-4. Smith stated that he was "told by numerous female members of my staff that Mr. Lugo had sent them unwanted sexually offensive emails," Smith Decl. ¶ 3; Lugo admitted in his deposition to sending such emails, see Lugo Dep. at 58; and there is written confirmation by the recipients of these emails that they in fact did receive them, see Lugo Decl. Ex. 16; Smith Decl. Ex. A.[13] The

---

[13] Lugo's brief in opposition to the summary judgment motion disputes that he ever sent the sexually explicit emails. See, e.g., Pl. Opp. Mem. at 10 (emails were "fraudulently put together" by Hong, Smith, and Morales); accord id. at 7-8, 22-24. There are three problems with this assertion. First, Lugo has submitted no admissible evidence to support it. Second, Lugo admitted at his deposition that he sent the emails. See Lugo Dep. at 58; see also footnote 16

sending and accessing of sexually explicit materials on a work computer is a legitimate, nondiscriminatory ground for an adverse action.  See, e.g., Pacenza v. IBM Corp., 2009 WL 890060, at *12 (S.D.N.Y. Apr. 2, 2009) (termination nondiscriminatory because plaintiff employee "accessed a sexually oriented chat room on his work computer"), aff'd, 2010 WL 346810 (2d Cir. Feb. 2, 2010); Randolph v. CIBC World Markets, 2005 WL 704804, at *14 (S.D.N.Y. Mar. 29, 2005) ("finding that an employee engaged in sexual harassment is a legitimate, non-discriminatory reason for discharging an adverse employment action") (collecting cases).

Accordingly, we now consider whether Lugo has marshaled evidence that would allow a reasonable juror to find that he was given a negative job reference because of his protected EEO activity – rather than because the VA believed he had sent the improper emails.  See generally James, 233 F.3d at 154 (when employer articulates legitimate, nondiscriminatory reason for its action, "employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination"); Patterson, 375 F.3d at 221 (plaintiff may show "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination'") (citations omitted).

---

below (addressing Lugo's claim that his deposition testimony does not contain such an admission).  Given his deposition testimony, Lugo could not contradict it now even by a sworn affidavit, had one been submitted.  See, e.g., Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997) ("'a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment'" (quoting Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987))).  Finally, the question here is not whether Lugo sent the emails but whether the Bronx VA believed that he sent the emails, and whether this belief was in fact the reason for the giving of the negative job reference and the failure to hire. See, e.g., Ozemebhoya, 2007 WL 2593008, at *7 ("An employer may sustain its employment decision without showing that the information on which it relied in its investigation was correct, but only that it reasonably relied on such information.").

Certainly, as Lugo notes, see Pl. Supp. Mem. at 4-5, Hong unnecessarily disclosed to Hernandez that Lugo had filed an EEO complaint alleging a hostile work environment while Lugo was seeking employment at Hernandez's facility, see Hong-Hernandez Email; Hong Dep. at 31-33, though Hong did inform Hernandez that she could hire an employee with an existing EEO complaint against the Bureau of Veterans Affairs, see Hernandez Aff. at 10-11.  Taken out of context, the disclosure of Lugo's EEO complaint to Hernandez might constitute some evidence that Hong was trying to retaliate against him for filing the EEO complaint against Smith.  But this was not a situation where Hong provided this information to Hernandez for no reason.  Rather, it was Lugo's own EEO complaint that had generated the information regarding Lugo's sexually explicit emails.  Because Hong had learned about the emails as a result of the investigation into Lugo's EEO complaint, see Smith Decl. ¶¶ 3-4; see also Morales Decl. ¶ 5; Hong-Hernandez Email; Lugo Decl. Ex. 22, it is unremarkable that Hong would have revealed the EEO complaint when Hong appropriately disclosed to Hernandez that Lugo had sent the sexually explicit emails.

Notably the portion of Hong's email that constituted the negative job reference consisted precisely of the assertion that Lugo had sent the improper emails.  There is no admissible evidence disputing the fact that Hong believed that Lugo had sent the improper emails.  Nor is there any other evidence of discrimination, such as evidence that other employees were known to have sent sexually explicit emails – or to have engaged in equally inappropriate behavior – and that these employees were not given negative job references.  Therefore, there is no evidence that would allow a reasonable jury to conclude that Hong gave a negative job reference because Lugo had engaged in EEO activity or that the Bronx VA's stated reason for the reference was

merely pretext for unlawful retaliation.  See Reeves, 530 U.S. at 143.

Lugo also asserts that the Montrose VA's failure to hire him was an act of retaliation.

See Pl. Opp. Mem. at 3, 4.  Lugo asserts that this occurred because Nancy Winter "inform[ed]

Ms. Olga Hernandez of [his] EEO activity," id. at 21, and told Hernandez not to hire Lugo, see

Pl. Supp. Mem. at 6.  As an initial matter, there is no direct evidence that Winter played any role

in the decision not to hire Lugo because Hernandez testified that she had already made her

decision not to hire Lugo prior to her conversation with Winter and that she had "already

submitted the paperwork."  Hernandez Dep. at 21.  In any event, Lugo's failure-to-hire allegation

fails for the same reason as does his claim of retaliation based on Hong's negative reference.

That is, Lugo has failed to marshal any evidence from which a reasonable juror could conclude

that Hernandez's decision not to hire Lugo based on the sexually explicit emails was merely a

pretext for unlawful retaliation.

      E.    Lugo's Claims Regarding Discovery

Lugo asserts with little explanation that "the defense caused prejudice on me [sic]

because discovery in this matter has not been substantially completed."  Pl. Opp. Mem. at 28.

To the extent Lugo is asserting that summary judgment should be denied because he was not

permitted to conduct discovery, such a claim is governed by Fed. R. Civ. P. 56(f), which

provides that "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it

cannot present facts essential to justify its opposition, the court may . . . (1) deny the motion; (2)

order a continuance to enable affidavits to be obtained, depositions to be taken, or other

discovery to be undertaken; or (3) issue any other just order."

Lugo's application is insufficient under Rule 56(f), however, because a party opposing

summary judgment based on a lack of discovery must submit an affidavit showing:

> (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.

Guarary v. Winehouse, 190 F.3d 37, 43-44 (2d Cir. 1999) (internal citations and quotation marks omitted) (brackets in original); accord Fed. R. Civ. P. 56(f).  Lugo has not submitted an explanation in any form that satisfies these elements.

In addition, Rule 56(f) "applies to summary judgment motions made before discovery is concluded."  Johnson v. Goord, 487 F. Supp. 2d 377, 403 (S.D.N.Y. 2007) (citation and internal quotation marks omitted), aff'd, 305 F. App'x 815 (2d Cir. 2009); accord McNerney v. Archer Daniels Midland Co., 164 F.R.D. 584, 588 (W.D.N.Y. 1995) ("Applications to extend the discovery deadline must be made prior to expiration of the deadline. . . . Rule 56(f) is not intended to circumvent discovery orders."); accord Lane v. Lucent Techs., Inc., 2007 WL 2079879, at *3 (M.D.N.C. July 13, 2007) ("Generally, a party must file a motion to compel before the close of discovery in order for that motion to be deemed timely.").  Here, Lugo was given ample opportunity to conduct discovery.  The discovery deadline was initially set for August 15, 2008.  See Memorandum Endorsed, filed Mar. 11, 2008 (Docket # 26).  It was ultimately extended to April 30, 2009.  See Memorandum Endorsed, filed Mar. 4, 2009 (Docket # 34).  Lugo took depositions of seven Government employees.  Pl. Opp. Mem. at 30.  The complaints regarding discovery raised by Lugo in his summary judgment opposition were never previously presented to the Court.

And even if the Court were inclined to consider Lugo's discovery applications at this late hour, they would be denied.  Lugo argues that the Government's counsel interfered with his

ability to take discovery by wrongfully objecting during his questioning of Mary Ann Musumeci,
instructing her not to answer, "badgering" and "harassing" Lugo during his questioning, and
restricting his time to depose the witness.  Id. at 29-31.  The Court's review of the Deposition
Transcript of Mary Ann Musumeci, dated Apr. 3, 2009 (annexed as Ex. 3 to Lugo Decl.)
("Musumeci Dep."), however, shows that counsel's behavior was entirely appropriate.  Rule
30(c)(2) of the Federal Rules of Civil Procedure states that an objection "must be noted on the
record . . . [and] stated concisely in a nonargumentative and nonsuggestive manner."  While
counsel objected at times, she did not direct the witness to refrain from answering questions
unless they related to attorney-client privileged information.  See Musumeci Dep. at 54.  Nor did
counsel badger or harass Lugo during the deposition.  Rather, she assisted him in explaining the
rules of questioning based on exhibits, see id. at 10-15, and gave him time to think, id. at 17, 44.
Finally, although counsel made clear that she and the witness would not be available after a
certain time, Lugo indicated that he did not "feel rushed at all" by that restriction.  Id. at 53.
Thus, Lugo's claims of impropriety are without merit.[14]

Finally, Lugo asserts that he was "badgered and harassed" by counsel for the
Government because he was repeatedly asked if he had ever sent sexually explicit emails at
work, and she did not "accept[]" Lugo's answer.  Pl. Opp. Mem. at 29-30 (citing Lugo Dep. at
47-58 (annexed as Ex. 29 to Lugo Decl.)).  He also stated for the first time that he was
"incoherent" during his deposition.  Id. at 30.  The deposition excerpts cited by Lugo, however,

---

[14] Lugo states that counsel for the Government objected improperly during the seven
depositions that Lugo conducted.  Pl. Opp. Mem. at 30.  He has not provided any examples,
however.  Lugo also complains that counsel "conferred with some of the witnesses [during the
depositions] which is improper procedure during a deposition."  Id. at 31.  Again, he points to no
specific examples of such activity.

show that counsel for the Government simply asked Lugo directly whether he sent the emails

and that Lugo thereafter improperly tried to avoid answering the question.  Lugo Dep. at 48-58

(annexed as Ex. 29 to Lugo Decl.).  There is nothing in the pages cited by Lugo to suggest that

he was "incoherent."  Instead, the pages reflect that Lugo was using any ruse he could think of to

avoid answering the question.  Ultimately, he answered the question directly.  Lugo Dep. at 58.[15]

      In sum, Lugo cannot avoid summary judgment on the ground of any alleged failures in

the discovery process.

IV.    CONCLUSION

      For the foregoing reasons, the defendant's motion for summary judgment (Docket # 54)

should be granted.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

      Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days including weekends and holidays from service of

this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a),

(b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Lewis A. Kaplan, and to the undersigned, at 500 Pearl Street,

---

[15] We reject Lugo's claim that his answer reflects that he was agreeing with only a portion of the question put to him relating to other employees sending emails and not to the portion relating to Lugo sending emails.  See Pl. Opp. Mem. at 30.  Lugo's answer of "yes" to the question showed his assent to the contents of the question, not to some selected portion of its contents.  In any case, the Court construes earlier colloquy on the topic to reflect that Lugo admitted to sending the emails "among consenting adults."  Lugo Dep. at 49.  And, of course, the question in this case ultimately is not whether Lugo sent the emails but whether the VA reasonably believed he did so and acted on that belief in giving the negative job reference and failing to hire him at Montrose.

New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Kaplan.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated:  May 19, 2010
　　　　New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Edwin Lugo, Jr.
7 Balint Drive, Apt 420
Yonkers, NY 10710

Mara E. Trager
Assistant United States Attorney
86 Chambers Street
New York, NY 10007

New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: May 19, 2010
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Edwin Lugo, Jr.
7 Balint Drive, Apt 420
Yonkers, NY 10710

Mara E. Trager
Assistant United States Attorney
86 Chambers Street
New York, NY 10007

33